Good morning, ladies and gentlemen. Judges Bumate and Piaz and I welcome you to the Ninth Circuit. I'm going to just go over a few things before we start, just so that you have a sense of how we proceed. Basically, I'm going to handle one matter first that's a submitted matter, but otherwise I'll call the cases in the order that they're on the calendar. By each of your cases, you have a time designation. And if you are the appellant, that time includes all your time, including any time that you wish to reserve for rebuttal. Now, it's your responsibility to keep track of your time. However, if when you come to the podium, you tell me aspirationally how much time you would like to save for rebuttal, I'll try to remind you when you get there, because I'm looking at a clock. The clock counts down, then it goes up. That doesn't mean I gave you extra time. It means that you've gone into overtime. So expect to be kept to your time. However, I know you came here to say certain things, but we also have to decide your case. And so it's really important that we have our questions answered as well in order to decide your case. So if a judge is asking you questions and your time has run out, you don't need to ask for permission to continue. Continue answering questions as long as I or any of my colleagues have any questions. And you don't even get to, if it's a really hard question, you don't get to say, well, your honor, my time's up. I'd like to sit down. So that's basically, if we take up all your time, I do have the authority that I can give you a little time for rebuttal if we feel that that is necessary at that particular time. So the first submitted matter is Evanston Insurance Company versus Roman Catholic Bishop of Orange 25-3165. That matter has been submitted on the briefs and we are going to submit it as of this date. However, we are waiting for another case. And if for some reason that case is delayed, we understand that we can withdraw submission if that becomes necessary. But we'll submit it as of this date. All right. The first matter on for oral argument is Jose Alberto Vasquez Macias versus Todd Blanche 24-5766. I do realize that this is a pro bono case and I just want to say in advance, you know, we appreciate everyone that comes to court. And obviously, we particularly appreciate people when they're very well prepared and can answer all of our questions. But I do want to, so, because I don't want to forget that we do like, we realize that when people do pro bono cases as part of our program, we guarantee argument and we appreciate that you devote the services to do that. And it does facilitate our decisions in a case. So thank you for doing, thank you everyone for being here, but thank you for doing pro bono work. And it's my understanding that you're not splitting any time. Is that correct? Correct. All right. So we're ready to proceed. So good morning and please state your appearance. Good morning, Your Honor. Becca Steinberg for Petitioner Jose Vasquez. With the court's permission, I'd like to reserve three minutes for rebuttal. Three? Three. Yes. All right. Go ahead. Thank you. Thank you. You have 15 minutes each side. Mr. Vasquez is a U.S. citizen. He moved here when he was five and his mom became a citizen when he was 14. His mom had sole custody. So as long as there had been a legal separation between his parents, Mr. Vasquez became a citizen too. Under the INA, there are two components of a legal separation. First, a court must have recognized that a separation has occurred. The Tijuana order did that when it recognized that Mr. Vasquez's father had abandoned his mom. Second, the law must attach consequences to that kind of separation. That condition is also satisfied. That's clear from the Mexican and Baja California civil codes. But even more tangibly, it's clear from the Tijuana order itself. That order allowed Mr. Vasquez's mom to make immigration and passport decisions on his behalf because it recognized that her husband had abandoned her. So we have, I know that the government is taking a different position on it that the order that we're talking about had to say more. And so the order we're talking about was in Baja, I guess, and basically the mother was wanting to take the child, get a passport and travel with the child, right? Your Honor, it was to get him to be a lawful permanent resident of the United States. To get what? Lawful permanent resident status of the United States. Okay. And so as a part of that, um, there was discussion about abandonment. And so the question is, you have to have a separation in order to get what you want here. And so your argument is that in order to get this custody order to be able to do what she was doing, they had to find abandonment and therefore you should be entitled. So then he gets the derivative citizenship, right? Your Honor, they did find abandonment, the orders at AR 146. And it recognized Mr. Jose Alberto Vazquez-Perez, that's the father, abandoned the plaintiff, that's the mother, and her youngest son for approximately nine years. So we know they weren't divorced and it doesn't say it's a legal separation. So there is a question here as to whether the Tijuana court order used abandonment, quote unquote, colloquially or as a legal term of art. What is your best argument that the court order used abandonment as a term of art? And what evidence in the record supports your argument? Your Honor, I have three responses to that. The first response is that it actually did impose legal consequences as a result of the abandonment. That is, before the Tijuana order, Mr. Vazquez's mom was not able to make these decisions without the father's input. After it, she was. So there were consequences directly imposed as a result of this order. Second of all is that abandonment comes into play throughout the Mexican civil codes. Repeatedly, we've cited a number of instances in our brief. But third, Your Honor, if you would like to find out more about how this term is used, this court could certify to the district court under 1252B5B. That's if there's a factual question about how the term was used and that would be the appropriate method of recourse. The government points to a statement made by Vazquez's mother as evidence that there was no legal separation. After being asked if there was a legal separation before her divorce, she responded no. What are we to do with that statement and how, if at all, does it factor into our analysis? It doesn't factor into the analysis at all, Your Honor. This is from Guiha. It's that a person's subjective understanding of what had happened has no bearing on the legal question of what the order actually means. But if you are wondering about her subjective view of it, she's consistently maintained that she was separated from Mr. Vazquez's father. And the government doesn't contest that. Whether or not she understood that separation to be legal is not relevant to the question of whether it was. How do I know it allowed her to have control of her child? How do I know that it means she was necessarily legally separated? For two reasons. The first is that it said, so when a court recognizes the functional separation, that functional separation turns into a legal separation. Permanentian, the legal separation under the INA is not limited to the formal legal separation process that that jurisdiction's regime allows for. So if there are consequences in that jurisdiction of a functional separation, and the court recognizes the functional separation, that recognition turns the functional separation into a legal one. Let's take Manassian as an example. So what impact, if any, does the 2003 divorce decree have on our analysis here? Does it matter for purposes of our review that the divorce decree does not mention prior separation? No, Your Honor, it doesn't. So first is that divorce decree doesn't change the prior separation. There can be multiple points of separation in a marriage. That was true in Manassian, where the divorce decree itself could have been a point of separation, but it nonetheless recognized an earlier point of separation. But second of all is that doesn't matter because she didn't know about the divorce decree at all, so there would have been no way for her to put in any evidence. The parties had been so separated at that point that she wasn't even aware that the divorce decree was being filed. So your client basically had temporary residence, but then he basically committed crimes for like 20 years, right? He was a lawful permanent resident, and it's our position that he was a U.S. citizen. But then he's committed crimes, and he currently has what he said sex-resistant. Yes, Your Honor, but the question in this case is whether he became a citizen when he was 14 years old. What happened afterwards doesn't change that. Our country has a way of doing it. Well, right, because otherwise he would not be able to. He can't get citizenship. He can't. He's blown all of the ways to get it on his own, so he has to get a derivative from his mother. So it's our position that he had gotten a derivative from his mother when he was 14 before anything. It's an automatic process. There's no paperwork that needs to happen. Nothing else needs to happen except for that the conditions under 1432 need to be met. As to his criminal record, our country has a way of dealing with people who commit crimes. It's through the criminal justice system, but if they're a citizen, then they are a citizen, and that's not dependent on the criminal record. So I think the BIA faulted you for not citing any Mexican law. Are we talking we have to look at what Mexican law looks at on this? There are two alternative ways that this court can reach the outcome. One is just by looking at the Tijuana order, which imposed legal consequences as a result of the recognition of abandonment. Because there are those immediate consequences in this case, you don't have to look further towards Mexican law. That said, you can look further towards Mexican law, and we've cited a range of Mexican law in our brief, including Mexican law that alters the availability of divorce, alters property, based on abandonment. So that is an alternative path that this court could take as well. So the one question I have, under Mexican law to be legally separated, it has to be unjustified abandonment, correct? Correct, Your Honor. And under Article 163 of the Mexican Civil Code and 160 of the Baja California Civil Code, abandonment is presumed to be unjustified. There is a separate provision of the Mexican Civil Code that's 267, subpart 18, where it doesn't have to be unjustified, but most of them do say unjustified abandonment. So your argument is because the order uses the word abandoned, it doesn't have to make any further findings of unjustification for it to be a legal separation? Yes, we have two arguments on that. The first is that the lack of justification is presumed under Articles 163 and 160, but the second is that under Article 267, part 18, it doesn't even have to be unjustified at all. But doesn't a court, under Mexican law, does a court have to make an express finding of abandonment was without good cause or justification? Are you saying you're writing that completely out, or is abandonment under Mexican law presumptively unjustified, absent a court finding to the contrary? So what's your best authority supporting your position here? Our best authority is Article 163 of the Mexican Civil Code and Article 160 of the Baja California Civil Code, which states a presumption that spouses shall live together unless the court exempts them from doing so. So there's a couple of cases I think that both of you were throwing around. I think Manasian's one, and then there's another case. Yes, Your Honor, Guijar. And I'm just not convinced that either of them, you know, give us an exact answer. So I think there are two ways to approach this case. One is through Manasian. Everything that, you know, Manasian had that satisfied legal separation exists here too. But if this court wants to look to Guijar instead, there are three things that the court in Guijar said was lacking, and those are the exact same three things that distinguish this case from Guijar. So first, in Guijar, the court said that there was no discussion of the absent parent at all. That's different here, where the court order expressly mentions that the absent parent, the father, had abandoned the mother. Second, in Guijar, the court said that there was no additional evidence about Peruvian law, and here we have that. We have the Mexican Civil Code provisions that provide evidence about the state of the law. And the third thing in Guijar is that the court said that there was no proper evidence about whether that order signified that it amounted to the mom having abandoned the marriage. Here we have the court order expressly saying that the dad had abandoned the marriage when it said that the dad abandoned the mom. So I always, okay, one of the things that I always like to think about, and I'm going to ask your friend on the other side this too, is when you ask for a rule, I think that there's a little, as I've said, and I'm not speaking for my colleagues, but I'm sort of struggling with the two cases. How many people does this, I don't like to, I'd like to know what the consequences of a rule are. Are you asking for a rule that's just open up an avenue for lots of people that would not otherwise be able to be citizens? No, your honor, and that's true for two reasons. The first is that legal separation is just one of many requirements, including they have to be a lawful permanent resident, the parent has to have sole custody, and they have to be a minor at the time. But second is that this provision of the INA was actually amended in the year 2000. So since that amendment, the legal separation requirement hasn't existed at all. Congress chose to get rid of it. So this isn't the operative provision anymore. It's not something that's going to have far-reaching effects. What's the standard now? The standard now, it's at 8 U.S.C. 1431. So three things have to be true. First, at least one parent has to be a citizen. Second, the kid has to be under the age of 18. And third, the kid has to be residing in the U.S. in the legal and physical custody of the citizen parent. So the legal separation requirement no longer exists. So if one parent's in Mexico and one's in the United States, that's enough to get rid of the citizenship, even if they're not legally separate? Yes, Your Honor. Okay. Thank you. So we're looking at 1432 at the time as a statute that was in existence at the time of the abandonment. Yes, Your Honor. That's right. Or it was at the time that the mom became a naturalized citizen. At the time the mom became a naturalized citizen. Yes, Your Honor. If there are no further questions, I preserve the remainder from the battle. Thank you. Thank you. Thank you. Good morning. Good morning, Your Honors. My name is Anna Edwards, and I represent the Attorney General of the United States. Your Honors, this court should deny the petition because the 1996 Tijuana order does not establish by preponderance of the evidence that the petitioners were parents were separated prior to the point in time where he turned 18 years old. As mentioned by my friend on the other side, this is a pure legal question that's narrow for the court to decide here today. To get derivative citizenship under Section 1432, they had to prove at some point in time that didn't have to be simultaneous. Four things had to be true before he reached 18 years old. One was his mother was naturalized, that he was lawfully within the United States, that the mother had sole custody. She got naturalized. He was under 18. It's just the separation thing. We're looking at that court order. What does that court order stand for? The court order at best recognizes... Are we, do we interpret it under Mexican law or what? Do we agree on that? Yes, Your Honor. We were looking at Mexico law because that's the state of the, um, where the union came to be. And so we're defining Mexico law for the purposes of figuring out whether there's a legal separation. Well, tell me how it could have happened. I mean, basically, she's saying that it's sort of, it wouldn't, she wouldn't have gotten to the, the custody and being able to move the child the way she was, if in fact, the child had not been abandoned. And that, therefore, she's in that, in abandonment, we talked about good cause or with, or justification. So tell me how it could have happened without finding, uh, satisfying, uh, the, this, this legal separate, the separation part of it. Sure, Your Honor. So to address your question specifically, if there was a finding with respect to defining the marital relationship between the two parents and then finding there was a termination or a separation or an abandonment of that, then we would have a closer question of whether there was under Mexico law, that determination of abandonment would be understood to be a legal separation under Mexico law. Well, so what, what, what would, what would you have to see here in order to, uh, grant the petitioner what he's asking? Well, so some bright line considerations. One would be even recognition of the marital relationship. And then two would be a legal determination as to the status of that relationship if it terminated. And if that termination or separation, functional separation would be understood by Mexico law to be a legal separation is recognized by law, similar to Manasian where you had the California law recognized as a legal status, that factual and functional separation. But here the court order does not even go that far. Did you say that, that, that the, that the, that the Mexican order, the Baja California order, that it has to recognize the marital relationship? To find that there's some separation of, or breakdown as this court recognized in Manasian. Well, it does recognize that there was a relationship, doesn't it? Respectfully, no, Your Honor. No, it doesn't. It just, so what does it say? In your view, what does this order say then? It says that the, the father had abandoned the family. So that the father means what? The father of the child. Right. And there's no recognition on the face of the order that the father is also the spouse of the mother. And so therefore, because there's no textual evidence of a marital relationship between the two parents of the child, we cannot understand the simple colloquial term of abandonment to reach to a dissolution or a breakdown in the marital unit as opposed to the familial unit, which is exactly what this court looked at. It said that even crediting the father's determined, or the father's testimony that there had been an abandonment of the father and the child, the court did not understand that to be a finding about a breakdown or an abandonment of the marital relationship. Here you have the Tijuana court order is from a family judge that's looking at whether he can give authorization for the mother to proceed with immigration and passport proceedings. And so looking at the- Are you suggesting that the abandonment of his mother is not a recognition that they were married? No. Why else? How else would you abandon someone else? If they're not married, you're not abandoning anyone. Based on this court's reasoning in Guillot, it's best understood to be an abandonment of the familial unit, but not recognition of the spouse of the relationship. But who talks about that that way? You abandon a legal family. You don't abandon a girlfriend, right? Correct. But there's no recognition that the two individuals were married. And so this court's order- That's what I'm saying. By using the word abandon, doesn't that have recognition that they were married? Have you ever heard the term you've abandoned your girlfriend? I mean, no, not in the legal sense, Your Honor, but- Or colloquial sense either. When you use the term abandonment, that means you're abandoning a legal family. Correct. Colloquial and legally. Colloquial and legally. The question is, based on the context of this order and the scope of relief granted by the Tijuana court, whether we should understand that abandonment to be factual or an actual legal determination. Based on how this court looked at that in Guillot, without more showing the framework and the necessary legal predicates for regaining relief under Article 418 for those passport procedures, we're left guessing and left speculating whether that's a determination about the abandonment of the marital relationship. If it said that it was an abandonment without good cause or justification, would the petitioner be in a better position? A better position, for sure, because then there's recognition of the legal framework about that marital relationship by citing abandonment with respect to language that would show divorce, relating back to the divorce. In your view, it should have said husband and wife or something. That would give this court better evidence of the understanding, and we would not be speculating about what that meant. Who's speculating? So you're saying that by looking at this order, I have to speculate. I would just be speculating that they were married. We would be speculating about the legal determination. Well, legal or not. Legal. I mean, in some jurisdictions, and I don't know if this is the case in Mexico, but you don't have to actually be, under some law, you don't have to actually go through a formal ceremony to be married. That's correct. Right? Which is why we have to look at the evidence of the Mexico law here. Right, and the Mexican law talks about abandonment in many different ways, and so when it uses the word abandonment, it's clearly referencing that term. It's a term of art under Mexican law. Yes, but I would respectfully submit to the court that lacking from the face of the order beyond the use of the term. Lacking what? The use of the word abandon, which is a term of art under Mexican law. Correct, but there's no citation to that Mexican law demonstrating that it was used in that way. I mean, do you have any evidence to say that every Mexican law order references the statute that they're referring to? No, Your Honor, but when we look— So, I mean, then you're asking us to speculate that they're not using abandon as a legal term as, you know, when there's a whole body of Mexican law that uses abandon in that way. Correct, Your Honor, but I think taking a step back, when we look at the scope of the to remove the child from the jurisdiction without both parents' consent. Right, but isn't that irrelevant? Because the statute only requires recognition of the legal separation, not that the document itself confers that. Correct, but when we're looking at that Tijuana court order itself, you're assessing whether to get the relief the mother was requesting, which is to remove the child from the jurisdiction without both parents' consent, which requires— Well, it sort of seems, but you have evidence in the record that they got divorced later, right? So, I think that we can fairly safely say they were married. Now, whether they were separated, that might be a different situation, but just like I asked your friend on the other side, what sort of—if we were to find merit in the petitioner's position here, what sort of Pandora's box are we opening? Well, because this statute is now rescinded, I'm not sure how many claims come up a year to people seeking derivative citizenship under 1432. I've never seen one before, and I've been doing this for a very long time. Correct, and the Office of Immigration Litigation certainly has a few a year, but that's not common anymore. But the consequences of that, it would be reading the term legal out of the statutory phrase legal separation. And because the Constitution vests Article I with the judgment to set forth a uniform rule of naturalization, this court should give full effect to each word in the statute as it interprets every statute. So the United States does not dispute that there is a functional and a factual separation of the parents in this case and of the spouses in this case. But the question is whether we should understand that factual separation as a legal separation as required by the statute. And this court's precedent has been very clear that separation is not mere factual separation or functional separation. If he wasn't a sex offender, would we be here? No, Your Honor, because the grounds for his removal, given that he has an LPR status, would not be revoked justifying the removal here. So if the Tijuana order just said unjustified abandonment, then would you say that he's a citizen? I think it would be a closer call, because there we're talking about it would be a legal term of art. And then the question at that point, why I'm hesitating on that question, would be whether Mexico law recognizes abandonment itself as a legal separation or rather just a factual predicate to justify divorce down the road. I mean, there is all these laws that talk about unjustified abandonment, right? Correct. So you're not challenging how they've interpreted or translated the Mexican laws, right? No, I think the only open question on that point as a matter of law is whether the status of abandonment itself would be understood as a legal separation or whether that's just a grounds to justify divorce. I thought your argument was that you agree that it's abandonment, but because they didn't it unjustified abandonment that it doesn't quite equal legal separation under Mexican law. Correct. Because I think that goes to the fact of it being a factual determination. So the fact that the order says that he abandoned his wife for nine years or abandoned his mother for nine years, doesn't that show that it's unjustified because under Mexican law, abandonment for more than six months is considered unjustified? No, Your Honor, because that law also talks about that living separate for six years would also have potential justifications, such as one person living outside the country. And so because here on the face of the order, we don't know whether merely living apart with or without just cause would be sufficient to find that it was just or unjust. I mean, your argument would be better if you presented Mexican cases that show that this type of detail is included in all these orders. Do you have anything to show that? No, and respectfully, it's not the United States' burden to prove what Mexico law means here. It's the petitioner's burden. Well, it would help your case, wouldn't it? Certainly. It would help our case. I recognize that it's their burden to, you know, they're seeking to use Mexican law and they have to inform us what Mexican law is. Correct. You know, if you're taking a particular position with respect to what some case in Mexico would help if you presented it to us. Correct. And it's not the United States' understanding based on its review of Mexico law that there is a similar legal status of legal separation that exists like California law, which the court looked at in Menacian. Because there are certainly grounds for divorce, the United States' understanding is that there's two legal statuses within Mexico, marriage and divorce. And although abandonment is a grounds to result in the legal consequence of divorce itself, there's not some separate status that's parallel to the California law for legal separation. Let me ask you this. Under Mexican law, if you want to get a divorce, do you have to sort of, you know, point to something like, you know, some reason for the divorce? I believe the petitioner actually sets forth several grounds or justifications for divorce. Well, so if you can't get a legal separation under Mexican law, the only, your argument, it sounds like, would be the only way that you get, you have to have a dissolution, a  You can get a divorce, but you can't get a legal separation. So how could they have gotten the document that you want them to get, even though they weren't living together, but Mexico doesn't recognize legal separation like we do? Correct. So we have to look at whether there's a legal separation under the law at the time. And respectfully, it doesn't have to be just a dissolution order, a divorce order. It has to be a court-issued recognition of the legal breakdown of the marriage, as set forth by this court in Menacian. And so respectfully, when we take a step back and we look at the determination here in the Tijuana order, it's talking about the child, the parent having custody to make determinations about whether the child can leave the country. But there's no legal consequence with respect to the marital relationship that stems from that order. It's just focused on this, of the parent-child relationship. We don't see it extend to the spouse-spouse relationship. And so although the petitioner looks at there being legal consequences that stem from that Tijuana order, it's legal consequences with respect to the father's rights to his child. Well, it seems, though, like, as we know the facts now, it seems like they would have met that standard if they had asked the court to say that. Perhaps so. But here we're looking for court-issued recognition of a legal separation. And respectfully, it's the United States' position that that 1996 Tijuana order certainly recognizes factual separation of the family, the factual aspect of the father no longer being with the child and with Miss Macias. But it is a jump to conclude that that relationship, or that order, also extended with respect to the marital relationship. And so the Guija order is on all fours here. Although it mentions the mother, this order does, contrary to the Guija order, it does not mention the spousal relationship, or much less— But where is the petitioner right now? Is he, like, in his 40s and has committed crimes for about 20 years? Where is he right now? Minor, he's not in custody, and he's in California following his sentence for his lewd activity with a minor under the age of 14. He's not in custody. This court has stayed removal. And so, therefore, the only way his removal is prevented from this country is if he proves his citizenship. And respectfully, the United States' position is that the Tijuana order at best recognizes functional and factional separation, which is not equivalent to separation by virtue of law as required under this court's precedent in both Guija and Menacion. Because this court must give full effect to every word in the statute penned by Congress, it cannot read the term legal out of the phrase legal separation. And we ask that you deny the petition. Thank you. Thank you. Thank you, Your Honor. Three quick points. The first is the difference between factual and legal separation. My friend on the other side said this was a factual separation. But respectfully, there was a court order recognizing that the separation occurred. That's what turns the factual separation into a legal one. Second, my friend on the other side raised a bunch of assertions about the state of Mexican law. There are no authorities that support any of those assertions that were made. And the last point is, what does the order here recognize? I'll read it to you right now. It says that Jose Alberto Vasquez Perez, that's the dad or husband, abandoned the plaintiff, Mrs. Yolanda Macias-Mendiola, that's the mom or wife, and her youngest son named Jose Alberto Vasquez Macias, for approximately nine years. It recognized that he abandoned her, not just that he abandoned the kid, not just that he abandoned the home, but that he abandoned her. You know, my friend on the other side talked about how it doesn't recognize the marriage. Judge Bumate, as you pointed out, it points out this abandonment. But further, under the INA, it just requires a legal separation. Nothing in the INA says that the same order that recognizes the legal separation has to also recognize the marriage. That's not a requirement. I'm happy to answer any other questions that this court has. They don't appear to have any additional questions. This matter will stand submitted then. Thank you both for your very helpful argument. I think you both very clearly articulated your positions, and we appreciate that kind of preparedness and understanding of the record. Thank you.
judges: PAEZ, CALLAHAN, BUMATAY